FILED
CLERK, U.S. DISTRICT COURT

JUL 1 7 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

POM WONDERFUL LLC, a Delaware
limited liability company,

                   Plaintiff,

v.

PURELY JUICE, INC., a Delaware
corporation; PAUL HACHIGIAN, an
individual; and DOES 1-10, inclusive,

                   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  CV-07-02633 CAS (JWJx)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This case was tried to the Court on April 11, 15, 16, 24, 25, 29 and 30, 2008. Thereafter by order dated June 16, 2008, the Court reopened evidence to consider what defendants contend is newly discovered evidence pertinent to the opinion of Dana A. Krueger of Krueger Food Laboratories, Inc. ("Krueger Food Laboratories"). On July 11, 2008, the Court heard further testimony from Mr. Krueger. Mark D. Campbell and Donald A. Miller of Loeb & Loeb represented plaintiff and Stephen E. Abraham of Fink & Abraham and Jay Hachigian represented defendants. Having carefully considered the evidence and the arguments of the parties, the Court finds and concludes as follows:

# I.    FINDINGS OF FACT

## A.    Plaintiff POM Wonderful LLC

1.    Plaintiff is the largest grower and distributor of pomegranates and pomegranate juice in the United States.

2.    Plaintiff grows and distributes only the Wonderful variety of pomegranates.

3.    In 2002, Plaintiff introduced the first pomegranate-based products marketed and sold on a national basis in the United States.

4.    Aware of the nutritional and health benefits associated with pomegranates, and sensing that an untapped market might exist, the founders of POM Wonderful LLC embarked on a strategic plan to bring this ancient fruit to the attention of the American consuming public.

5.    Plaintiff's strategy included the investment of millions of dollars on scientific research of the health benefits of pomegranates and pure pomegranate juice.

6.    Through this research, scientists have determined that 100% pomegranate juice has high levels of unique polyphenols that are largely responsible for the proven health benefits associated with 100% pomegranate juice.  Polyphenols are important antioxidants that are particularly effective at neutralizing free radicals, preventing oxidation of LDL cholesterol and plaque build-up in the blood vessels, and preserving nitric oxide, a key chemical in the body for regulating blood flow and maintaining vessel health.

7.    In addition to cardiovascular benefits, some scientific research shows that the high levels of polyphenols in 100% pomegranate juice have great promise in inhibiting cancer, particularly prostate cancer, as well as numerous chronic diseases associated with aging such as heart disease, Alzheimer's disease, and dementia. Research also indicates that 100% pomegranate juice may benefit diabetics.  [Exhibits 545-576].

- 2 -

8.     The health benefits observed in these studies are based on the use of 100% pomegranate juice containing no added sugars or preservatives.  The presence of added sugar and indeterminate adulterants undermines the proven health benefits of 100% pomegranate juice.

9.     POM Wonderful has received media and consumer recognition.  For example, POM Wonderful's pomegranate juice bottle has frequently appeared on television newscasts, cooking/lifestyle shows.  The exceptional health benefits of its products and innovative marketing campaigns, have also earned POM Wonderful various industry accolades.  For example, in 2005, POM Wonderful received the coveted Company of the Year Award at The Beverage Forum, the industry's leading trade show.  In addition, in its 2005 annual "America's 100 Best" awards, Reader's Digest named POM® branded pomegranate juice as the nation's "best healthy beverage."  POM Wonderful's success in selling pomegranate products by focusing on their health benefits has also been featured in a number of major publications. [Exhibits 284-544].

10.     Through its investment of millions of dollars to research and promote the nutritional qualities and health benefits associated with pomegranate juice, POM Wonderful has largely created the burgeoning market for genuine pomegranate juice that exists today.

11.     POM Wonderful's pomegranate juice has, in less than six years, eclipsed all other products in its market segment of super premium juices to take the top spot nationwide in supermarket sales, as well as the top spots in the key geographic regions of Los Angeles, Chicago, New York, Boston, Atlanta, Dallas, Pittsburgh and Charlotte. POM Wonderful's annual supermarket sales have grown from zero to well over $50 million in that same period.

**B.    Defendant Purely Juice Inc. and Paul Hachigian**

12.     Purely Juice markets and sells various bottled juice products and is currently one of plaintiff's competitors in the bottled pomegranate juice market.

13.   In April 2006, Purely Juice began marketing and selling a beverage labeled "100% pomegranate juice" which purports to contain 100% pomegranate juice. The product's label also claims to have "No sugar added."

14.   Purely Juice's "100% pomegranate" product has a 120-day shelf life from the date of production.

15.   Purely Juice's website advertised the "100% Pomegranate" product as "all natural" and states "[t]here [are] NO added sugar or sweeteners. The sugar on the label comes from fructose, a naturally occurring sugar in fruit." [Exhibit 174].

16.   Purely Juice's website also advertised that "[e]ach bottle of Purely Juice is 100% Pomegranate Juice" and that other "natural flavors DO NOT dilute" the 100% pomegranate juice content. [Exhibit 174].

17.   Purely Juice promotes the health benefits of pomegranate juice through printed advertising materials and the Internet.  [Exhibit 174].

18.   Purely Juice represents to consumers that "Medical Research is proving that pomegranate juice has amazing health benefits. Pomegranates are a good source of antioxidants. Pomegranate Juice is good for the heart." [Exhibit 172].

19.   Purely Juice further represents to consumers that "[p]omegranates are high in polyphenols, which have been shown in many peer-reviewed research publications to be the superior antioxidant responsible for the free-radical scavenging ability of pomegranate juice. [Exhibit 174].

20.   Purely Juice also represents to consumers that "Free radicals that are not neutralized can cause damage to the body's cells" and that "[t]here is good evidence that this damage contributes to a host of illnesses, including cancer and heart disease." Therefore "[c]onsuming more antioxidants help provide the body with the tools to neutralize harmful free radicals." [Exhibit 174].

21.   Purely Juice's "100% Pomegranate" product is sold for less per ounce than plaintiff's POM WONDERFUL 100% pomegranate juice product.

22.   Purely Juice markets itself as a lower priced option to plaintiff.  [Exhibit

172, pp. 3, 10].

23.     Purely Juice would lose its position in the marketplace if it could not label or advertise its product as "100% pomegranate juice" with "No sugar added."

24.     Unlike plaintiff, Purely Juice does not grow and process its own pomegranates.  Instead, Purely Juice relies on a broker, Perma Pom, to secure pomegranate juice concentrate from foreign suppliers in Iran and other countries in the Middle East.

25.     Paul Hachigian is the president and founder of Purely Juice.  Defendant Hachigian was directly involved in the manufacturing of Purely Juice's "100% Pomegranate" product, including the selection of suppliers of the pomegranate juice concentrate used in this product.

C.     **It Was Widely Known That The Market For Foreign Pomegranate Juice Concentrate Was Experiencing A Problem With Adulteration**

26.     In 2006, it was widely known in the super premium juice industry that there were serious issues of adulteration with pomegranate juice concentrate originating from outside of the United States.  The Court finds that defendants knew, or should have known, of these issues of juice adulteration.  [Exhibit 92].

27.     Scientifically accepted testing methodologies and guidelines were available for determining whether a particular sample of pomegranate juice concentrate was authentic.   The particular methods for the detection of juice adulteration included, among others, anthocyanin profile, sugar profiles, sorbitol detection, and polyphenol profiles, tests that could be performed by a variety of laboratories.

D.     **Plaintiff Discovers That Purely Juice Is Selling Adulterated Pomegranate Juice**

28.     In late 2006, early 2007, Matthew Tupper, the president of plaintiff, received a call from Terry Xanthos, the president of plaintiff's competitor Frutzzo.

29.     Mr. Xanthos told Mr. Tupper that Frutzzo had conducted testing which showed that Purely Juice was selling adulterated pomegranate juice with added sugar.

30.     Mr. Xanthos also explained that Purely Juice was seeking aggressively to gain shelf space and undercut the competition on price.  Mr. Xanthos expressed that Purely Juice could afford to aggressively price its product because it was purchasing pomegranate juice concentrate at well below the market rate.

31.     Based on this information, plaintiff retained Food Research, Inc. ("Food Research") to commission authenticity testing of Purely Juice's product.  Food Research thereafter retained Krueger Food Laboratories to conduct the tests.

32.     On February 21, 2007, Krueger Food Laboratories reported to Food Research that the sample tested "contains little or no pomegranate juice.  The solids consist primarily of corn syrup and non-pomegranate fruit juice."  [Exhibit 161].

33.     On March 1, 2007, plaintiff advised Purely Juice of the results of Krueger Food Laboratories' testing and demanded that Purely Juice take immediate action to remedy the problem.  [Exhibit 161].

34.     Purely Juice responded to plaintiff's letter on March 7, 2007, claiming that "all of our tests have yielded results well within the accepted legal guidelines (CFR 101.30 for juices) and our own quality specifications."  [Exhibit 198].

**E.     Plaintiff Expands The  Scope Of Its Testing On Purely Juice's Products**

35.     Concerned about the alarming results obtained in the first round of product testing, plaintiff requested that Food Research expand testing of Purely Juice's product to include additional samples and additional laboratories.

36.     Thereafter, Food Research obtained additional samples of Purely Juice's "100% pomegranate juice" at the retail level from three different locations in California and Virginia under full chain of custody documentation in accordance with Good Laboratory Practices.

37.     Food Research sent the samples for testing at seven independent laboratories.  Each laboratory evaluated the samples using tests specifically tailored to the unique markers of pomegranate juice.  The samples tested in late February and early

1    March had "enjoy by" dates of May 7, 2007, June 1, 2007, and June 23, 2007, and

2    represented three separate production lots.  Based on the 120-day shelf life of Purely

3    Juice's product, the Court finds that these samples were bottled no later than January 7,

4    2007, February 1, 2007 and February 23, 2007, respectively.

5          38.    After the testing concluded, Food Research summarized the results in an

6    April 2, 2007 report: "The consensus of several different laboratories is that 'Purely

7    Juice 100% Pomegranate Juice' cannot be considered as 100% pomegranate juice

8    because it: (1) Contains added sugars; (2) Contains added fruit juices; (3) Has diluted

9    active components – polyphenols, antioxidant activity, and potassium."

10          39.    The seven independent laboratories found as follows:

11          a.    Krueger Food Laboratories, which is located in Massachusetts and is

12    considered to be the leading juice authenticity testing laboratory in the United States,

13    performed a series of tests on five samples of Purely Juice's "100% pomegranate juice,"

14    including tests to identify added sweeteners and sugars.  These tests established that

15    Purely Juice "100% pomegranate juice" contained "high sucrose," *i.e.*, table sugar.  In

16    its certificates of analysis, Krueger Food Laboratories concluded that Purely Juice's

17    "100% pomegranate juice" "is not pure pomegranate juice" but rather "consists

18    primarily of cane sugar and corn sweetener, and contains little pomegranate solids."

19          b.    Eurofins Scientific Analytics, the world's leading laboratory specializing

20    in the analysis of fruit juice authenticity, also tested Purely Juice's product for the

21    presence of foreign sugars at its Nantes, France facility.  Eurofins has developed tailor-

22    made tests to assess the authenticity of juice based on its type.  As explained by Dr.

23    David Hammond, Eurofins' fruit juice and authenticity expert, its isotopic techniques to

24    assess fruit juice authenticity "are some of the most powerful procedures for detecting

25    juice adulteration."

26          To test Purely Juice's product, Eurofins used two normal screens to assess the

27    sample.  The first test, consisting of isotopic methods, is designed to look for beet-

28    derived and cane/corn sugar additions to the samples.  Isotopic methods "are possibly

1   the most efficient to date to detect whether the sugars in the juice sample actually come
2   from the fruit." The second screen used by Eurofins employs a wide range of analytical
3   methods in testing the overall composition of the product. The methods in this screen
4   are European Standard methods used by the International Fruit Juice Union or industry
5   approved procedures.

6        After testing Purely Juice's "100% pomegranate juice" under both screening
7   methods, Eurofins concluded it "was not 100% pure pomegranate juice and that it had
8   been extended with a large amount of sugar and other red/black fruit(s) had been added
9   to the product, to probably help enhance the color of the diluted product." According
10  to the Eurofins report, its testing indicated "a large sugar addition" and concluded that
11  the "sample cannot be considered as a 100% pomegranate juice."

12      c.    The University of Wisconsin-Madison, College of Agricultural and Life
13  Sciences ("University of Wisconsin-Madison"), is a recognized leader in the field of
14  anthocyanin analysis. Anthocyanins are powerful antioxidants that give pomegranates
15  their deep red color. Anthocyanin analysis is a "typical" and "effective" method for
16  examining berry juice authenticity.

17      The University of Wisconsin-Madison has "extensive experience performing
18  compositional testing and analysis of various fruit juices, including pomegranate juice"
19  and, under the supervision of Dr. Jess Reed, tested Purely Juice's product. Testing
20  using the High Performance Liquid Chromatography ("HPLC") method – a test "now
21  routinely used to detect the addition of cheaper fruit or coloring agents in red berry
22  fruit" – revealed that Purely Juice's product was missing two of the characteristic
23  anthocyanins that are generally found in pomegranate juice.

24      The University of Wisconsin-Madison also found that Purely Juice's juice
25  contained approximately 60% less polyphenols than expected in 100% pomegranate
26  juice. Polyphenols are important antioxidants that are largely responsible for the
27  proven health benefits associated with 100% pomegranate juice. Given the absence of
28  two anthocyanins characteristic of 100% pomegranate juice and the unusually low level

1  of polyphenols, the University of Wisconsin-Madison concluded that "the tested
2  product was not 100% pomegranate juice."

3      d.    The University of California at Los Angeles ("UCLA") Center for Human
4  Nutrition is a recognized leader in analyzing polyphenols that are unique to
5  pomegranates. UCLA, under the direction of Dr. David Heber, conducted yet another
6  test of Purely Juice's "100% pomegranate juice" using a method that quantifies two
7  characteristic polyphenols that are "unique markers" of pomegranate juice. UCLA
8  concluded that the "significant lower" "levels of characteristic polyphenols identified in
9  the Purely Juice© [sic] 100% Pomegranate Juice is not consistent with the levels
10 normally found in 100% pomegranate juice."

11     e.    Dr. Michael Aviram, head of the Lipid Research Laboratory at the
12 Technion-Israel Institute of Technology, Faculty of Medicine, is an internationally
13 recognized expert on cholesterol oxidation and cardiovascular disease with a special
14 emphasis on dietary antioxidants such as red wine, olive oil, licorice, and
15 pomegranates. Dr. Aviram tested Purely Juice's "100% pomegranate juice" for its
16 polyphenol concentration and free radical scavenging capacity. He found that Purely
17 Juice's juice had less than a third of the polyphenol concentration and free radical
18 scavenging capacity of POM's 100% pomegranate juice. According to Dr. Aviram's
19 testing, Purely Juice's product contained only 28% of the polyphenols typically found
20 in 100% pomegranate juice.

21     f.    Covance Laboratories, Inc., located in Madison, Wisconsin, has more than
22 sixty years of experience in nutritional testing as well as phytochemical and botanical
23 analyses. Covance is recognized for its expertise in the design of testing programs to
24 comply with regulatory mandates and scientific standards. Covance provides
25 specialized methodologies to substantiate claims of quality and purity. Covance tested
26 the antioxidant levels of Purely Juice's "100% pomegranate juice" using an analytical
27 method known as the Oxygen Radical Absorbance Capacity method. Minnesota-based
28 Medallion Labs tested Purely Juice's product using a different analytical method, the

1   DPPH method, to test for antioxidant activity.

2        Using two different testing methods, both laboratories found that Purely Juice's

3   "100% pomegranate juice" had abnormally low levels of antioxidant activity,

4   containing merely a fraction of the antioxidant activity typical of 100% pomegranate

5   juice.

6        40.    Dr. Heber is a recognized expert on the role of phytochemicals in the

7   prevention and treatment of cancer and cardiovascular disease.  He has published

8   numerous articles directed to food and juice authenticity.  Dr. Heber reviewed the

9   reports, analyses, and conclusions of each laboratory and concluded that the

10  laboratories used the appropriate testing methods and that their conclusions were

11  justified by the test results.

12  **F.    Purely Juice's Own Testing Confirmed Adulteration**

13       41.    On February 12, 2007, Purely Juice commissioned Silliker Laboratories to

14  conduct what Purely Juice claims to have been a "random" test of its "100%

15  pomegranate juice" product with a use by date of June 3, 2007 (manufactured February

16  3, 2007). [Exhibit 221, DT-01-000002].

17       42.    On February 26, 2007, Silliker reported high levels of sucrose and corn

18  syrup in Purely Juice's "100% pomegranate juice" product. [Exhibit 201].

19       43.    Defendants were aware of the result of the Silliker test at the time they

20  received Plaintiff's March 1, 2007 letter, and at the time of their March 7, 2007 letter to

21  plaintiff denying any problem with their product.

22       44.    On March 12, 2007, defendants sent six additional samples to Silliker for

23  testing. [Exhibit 273, D-01-00282].

24       45.    On March 23, 2007, defendants received the results of this testing which

25  again confirmed the presence of high levels of sucrose and corn syrup in Purely Juice's

26  "100% Pomegranate" product. [Exhibit 273, D-01-00325-00328].

27       46.    March 13, 2007, defendants sent 9 product samples representing 21

28  different lot codes to Krueger for authenticity testing.  The samples were manufactured

1   on February 1, 3, 21, 22, 23, and 24.  [Exhibit 276, D-01-00271; Exhibit 276, D-01-
2   00272].

3          47.    On April 3, 2007, Krueger reported its findings to defendants.  The results
4   of Krueger's analysis on each of the nine samples was unanimous – these pomegranate
5   juice products "contain [] little or no pomegranate juice.  The bulk of the solids consists
6   of cane sugar, corn syrup, citric and malic acids."  Krueger's reports also noted an
7   "abnormal anthocyanin (antioxidant) profile."  [Exhibit 276, D-01-00273-00281].

8          48.    That same day, Purely Juice instructed its distribution center to hold
9   product with enjoy-by dates of June 2007.  Purely Juice did not, however, recall any
10  product – which Purely Juice's *own tests* then had just revealed to be adulterated – that
11  already had been shipped to retailers.  [Exhibit 205].

12         49.    Although defendants were first aware of a problem with their "100%
13  pomegranate" product as early as February 26, 2007, they continued selling the product
14  to consumers until after April 3, 2007.

15  **G.    Plaintiff Expands The Scope Of Its Testing To Other Competitors**

16         50.    In late February, plaintiff requested that Food Research expand the scope
17  of its testing to include further testing of Purely Juice's product and to test the products
18  of other competitors in the super premium juice market, including Fruitzzo, Naked
19  Juice, Fruitmost and Lakewood.

20         51.    The results of this testing suggested that Naked Juice, Fruitmost and
21  Lakewood were selling adulterated pomegranate juice products.  [Exhibits 46, 47, 48,
22  56, and 62].

23         52.    On May 18, 2007, General Counsel for plaintiff sent letters to Lakewood
24  Juices, Naked Juice, and Fruitmost.  [Exhibits 162-164].  Each of these companies
25  responded either orally, or in writing, that they took this matter seriously and would
26  investigate the matter immediately.  [Exhibit 165-166].

27  **H.    Post-Complaint Testing By Plaintiff Reveals Further Adulteration**

28         53.    Following the filing of its complaint, plaintiff continued to test Purely

1   Juice's product for adulteration using Krueger Food Laboratories. [Exhibits 67-70].

2      54.   On July 3, 2007, Krueger Food Laboratories reported that a sample of

3   Purely Juice's "100% pomegranate" with an enjoy by date of August 4, 2007, was not

4   "pure pomegranate juice" and "appeared to contain a small addition of an ingredient

5   containing sucrose…" [Exhibit 68]. Krueger Food Laboratories made an identical

6   finding with respect to a samples of Purely Juice's "100% pomegranate" with an enjoy

7   by dates of August 28 and 30, 2007. [Exhibits 69-70].

8      55.   On July 5, 2007, Krueger Food Laboratories reported that an additional

9   sample of a Purely Juice "100% pomegranate" juice product with an enjoy by date of

10  August 28, 2007, was not "pure pomegranate juice" and "appeared to contain a small

11  addition of an ingredient containing sucrose…" [Exhibit 67].

12     56.   The Court finds that the results of this testing confirms that as late as July

13  5, 2007, and as late as August 30, 2007 (the latest enjoy by date on the tested samples)

14  defendants were selling a "100% pomegranate" product which was "not pure

15  pomegranate juice" and which contained the "addition of sugar and anthocyanin

16  containing additives."

17  **I.    Defendants' Product Was Adulterated**

18     57.   The Court accepts the testimony of Dr. Heber and Mr. Krueger that certain

19  analytical characteristics exist in all pomegranate varieties within scientifically

20  accepted ranges. Those characteristics, which can be measured in pure pomegranate

21  juice concentrate, include, but are not limited to: (1) the absence of D-sorbitol; (2)

22  common anthocyanin patterns; and (3) potassium at ranges of between 1,500 to 2,300

23  mg/l. The Court finds that the products bottled by defendants on January 7, 2007,

24  February 1, 3, 21, 22, and 24, 2007, and April 4, 28, and 30, 2007, did not have the

25  scientifically accepted analytical characteristics of pure pomegranate juice.

26     58.   The Court further accepts the testimony of Dr. Heber and Dr. Krueger that

27  sucrose (i.e., table sugar) and corn syrup do not occur naturally in pure pomegranate

28  juice or pure pomegranate juice concentrate. The Court finds that the products bottled

1   by defendants January 7, 2007, February 1, 3, 21, 22, and 24, 2007, and April 4, 28, and

2   30, 2007, contained added sugar and sweeteners including sucrose and corn syrup.

3         59.    On July 11, 2008, the Court reopened evidence to hear further testimony

4   from Mr. Krueger regarding alleged irregularities occurring in certain Turkish

5   pomegranate juice, including with regard to its anthocyanin profile and a finding that

6   high levels of sucrose and sorbitol were present in this juice.  This evidence was offered

7   in order to defeat the assertion of Dr. Heber and Mr. Krueger that there is no

8   meaningful difference in the properties or the anthocyanin profile of varieties of

9   pomegranate juice obtained from fruit grown outside the United States.

10        Mr. Krueger testified that in 2007, he had gone to Turkey to conduct a normal

11  audit at certain pomegranate juice plants in Turkey as well as a specialized audit with

12  regard to a plant associated with pomegranate juice having a history of problems.  In

13  all, Mr. Krueger visited four plants.  Juice produced at three of the plants had trace

14  amounts of sorbitol and sucrose, and anthocyanin profiles consistent with other

15  varieties of pomegranate juice.  However, pomegranate juice produced at the Ersu plant

16  yielded unusually high levels of sorbitol and sucrose, as well as an anthocyanin profile

17  consisting of twelve peaks, rather than the six peaks found in the anthocyanin profile of

18  other pure pomegranate juice.  While Mr. Krueger has not determined the cause of this

19  variation and did not see any evidence of adulteration, the findings at the Ersu plant do

20  not alter his earlier opinions in this case because, among other things, all of the

21  pomegranate fruit used at the four Turkish plants came from like pomegranate fruit

22  grown in the same area of Turkey.  According to Mr. Krueger, it appeared that the fruit

23  processed at the Ersu plant was generally spoiled and held in tanks for long periods of

24  time.  Further, the Ersu juice, unlike juice at the other Turkish plants, was processed

25  with its seeds.  Mr. Krueger testified that he was not familiar with any findings from

26  scientists who has tested pomegranate juice grown and processed in other parts of the

27  world that exhibited properties and an anthocyanin profile different from American

28  varieties.  Therefore, Mr. Krueger concluded that the Ersu findings did not alter his

1    earlier findings regarding defendant's juice.

2           Further, defendants' pomegranate concentrate was in any event imported from
3    Iran, not Turkey.  Moreover, the presence of corn syrup in defendants' product strongly
4    suggests adulteration even if the Court were to assume that the anthocyanin profile of
5    defendants' pomegranate juice which was produced in Iran was altered due to the same
6    factors present at the Ersu plant in Turkey, an assumption which is wholly unsupported
7    by the record.

8           **J.     "Brix" Measures Juice Dilution, Not Juice Purity**

9           60.    FDA regulations require that products labeled "100% juice" meet a
10   specific minimum "Brix" level depending on the type of juice.  21 C.F.R. § 101.30.  For
11   example, the FDA requires a minimum Brix level of 16.0 for juice labeled as 100%
12   pomegranate juice. id. at § 101.30(h)(1).  Brix refers to "an equivalent sugar scale of
13   refractive indices for measuring soluble solids."  See <u>Nestle Refrigerated Food Co. v.
14   United States</u>, 18 C.I.T. 661, 662 n. 2 (Ct. Int'l Trade 1994).  More simply stated, Brix
15   is an approximate measurement of the amount of dissolved solids (sugars) in a given
16   liquid.

17          61.    The Court finds that the Brix measurements were implemented by the FDA
18   to prevent the simple dilution of fruit juices with water, and that Brix measurements
19   have little or no relevance to the authenticity, purity, alteration, and/or addition of
20   sugars of any particular type of fruit juice.  The measurement is almost entirely
21   irrelevant in detecting the sophisticated forms of dilution and/or product alteration
22   made possible by advances in modern medicine.  The authenticity of juice can only be
23   determined by subjecting it to scientifically accepted chemical analyses such as those
24   employed by the laboratories recited above.

25          **K.     Consumer Perception**

26          62.    The market in which both plaintiff and Purely Juice sell their products is
27   referred to in the industry as the super premium juice category.

28          63.    Plaintiff presented credible evidence that consumers send questions to both

1   plaintiff and Purely Juice [Exhibits 223 and 177], which make clear that consumers are
2   extremely concerned about product ingredients (including sugar) and how those
3   ingredients will either improve or hinder their health.

4          64.    Plaintiff's internal market research further shows that the primary reason
5   that its customers drink POM Wonderful is for the health benefits.  [Exhibit 178].

6          65.    Accordingly, this Court finds that consumers are likely to base their
7   purchasing decisions upon precisely the kinds of false statements contained in Purely
8   Juice's marketing, particularly the untrue statements about its products consisting of
9   "100% pomegranate juice" and containing "no sugar added."

10   **L.    Defendants Purchased "Pomegranate Concentrate" for Prices Well**
11   **Below Market Prices for Pure Pomegranate Concentrate**

12          66.    This Court finds that during the relevant periods, the market price for pure
13   pomegranate concentrate was no less than $30 per gallon, and in many instances,
14   significantly higher.  In fact, at various times during the relevant periods, plaintiff was
15   selling its pure pomegranate juice concentrate for upwards of $50 per gallon.

16          67.    The Court finds that at various times relevant to plaintiff's claims, Purely
17   Juice was purchasing pomegranate concentrate for well below the established market
18   price for pure pomegranate juice concentrate.

19   **M.   Plaintiff's Damages**

20          68.    Based on the evidence presented concerning consumer buying habits and
21   the admission by defendant Hachigian that Purely Juice would have lost its place in the
22   market if it could not label or advertise its product as "100% pomegranate juice" with
23   "No sugar added," the Court finds that Purely Juice would have lost most or all of its
24   market share had Purely Juice not misrepresented the content of its juice.

25          69.    The Court therefore finds that through the sale of its adulterated products,
26   Purely Juice was diverting sales of 100% pure pomegranate product from other
27   manufacturers in the super premium juice market.  However, the evidence presented at

28

1  trial supports a finding of adulteration only from January 7, 2007.[1]  To assess damages
2  from April 2006, as urged by plaintiff, would be speculative, since no evidence of
3  adulteration of Purely Juice's "100% pomegranate juice" was presented with regard to
4  any pomegranate juice that was manufactured prior to January 7, 2007.

5      70.    The Court finds that the amount of these sales for the period January 7,
6  2007 through August 30, 2007, are recoverable.

7      71.    However, the Court finds the calculation of incremental profits by Dr.
8  Barbara Luna, defendants' expert, to be more persuasive than those of plaintiff's expert,
9  Kenneth D. Rugeti, and concludes that assuming lost revenues of $3,073,497,
10 plaintiff's incremental expenses should be calculated to be $1,880,592, not $1,475,279,
11 leaving an incremental lost profit to plaintiff from defendants' false advertising of
12 $1,192,905.

## N.    Defendant's Lost Profits

14     72.    As set forth above, this Court finds that from at least the period beginning
15 at least January 7, 2007 through August 30, 2007, defendants were selling a product
16 that contained a false or misleading representation of fact concerning the nature,
17 characteristics, and qualities of its product.

18     73.    Further, the Court finds that defendants' sales during the period of false
19 advertising, as proven by plaintiff, were $ 3,667,393.  The Court further finds that
20 defendants' incremental profit margin during this period was 8.32%.  Accordingly, the
21 Court calculates defendants' profits to be $305,137 during the period of false
22 advertising.

---

25     [1]    The Court is mindful of the testimony of defendants' expert, Dr. Barbara Luna,
26 that plaintiff's lost profits should be based on an assumption that defendants' products
   were adulterated for only four weeks, but the Court finds that the basis for this assertion,
27 namely the opinion of defendant Paul Hachigian, is not persuasive.  In any event, the
   testing results recited herein show adulteration in products with an "enjoy by" date of
28 August 30, 2007.

## II.   CONCLUSIONS OF LAW

1.     In its complaint, plaintiff asserts three related claims for relief under federal and state law:  (1) false advertising under the Lanham Act § 43(a) 15U.S.C.§1125(a); (2)"15 U.S.C. § 1125(a)); (2) false advertising under  Section 17500 of  California Business & Professions Code; and (3) unfair competition under  Section 17200 of California Business & Professions Code.

### A.     Defendant Is Liable For False Advertising Under The Lanham Act

2.     Section 43 (a) of the Lanham Act prohibits the use of any "false or misleading description of fact, or false or misleading representation of fact" concerning the nature, characteristics, qualities or geographic origin of goods.  15 U. S. C. §§ 1125(a)(1)(A) and (B).

3.     A false advertising claim under the Lanham Act requires (1) a false statement of fact about the defendant's product in connection with its advertising; (2) deception of or a tendency to deceive a substantial segment of the advertisement's audience; (3) deception that is material, *i.e.*, likely to influence a purchasing decision; (4) defendant's introduction of its false statement into interstate commerce; and (5) injury or likely injury to the plaintiff as a result of the false statement. See SouthlandSodFarmsv.StoverSeedCo. 108 F.3d 1134 (9thCir.1997)

4.     The Court finds that Purely Juice's advertising from January 7, 2007 to August 30, 2007, was literally false, as demonstrated by the independent tests performed by seven different laboratories.  Although Purely Juice claimed that its adulterated "100% Pomegranate" product consisted of "100% pomegranate juice" and contained "NO added sugar or sweeteners," independent laboratory testing of the juice and found these statements to have been false.

5.     Where, as in this case, an advertisement is demonstrated to be literally false, the Court does not need to inquire into whether consumers were deceived or misled.  A plaintiff is entitled to relief under the Lanham Act on proof of literal falsity alone, as the court will assume that false statements actually mislead consumers. U-

1  Haul Intl. Inc. v . Jartran, Inc.,793 F. 2d 1034 (9thCir.1986); Harper House, Inc. v.
2  Thomas Nelson, Inc., 889 F. 2d 197, 209 (9th Cir. 1989) (even in non-comparative
3  advertising case, no need for actual evidence of consumer deception where defendant
4  engaged in intentional deception); see also Warner-Lambert Co. v. Breathasure, Inc.,
5  204 F. 3d 87 (3rd Cir. 2000) (where claim was "literally false, [plaintiff] did not have to
6  introduce consumer testimony, marketing surveys or proof of lost profits to enjoin the
7  use") Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
8  Consumer Pharm. Co., 906 F. Supp. 178, 181 (S.D.N.Y. 1995) ("a court may enjoin an
9  ad which is explicitly or literally false without reference to the advertisement's impact
10 on the buying public."); Energy Four, Inc. v. Dornier Medical Systems, Inc., 765 F.
11 Supp. 724, 731 (N.D. Ga. 1991) ("When representations are actually false, a court does
12 not have to determine whether the representations are likely to create confusion" and
13 actually false claims are presumed material).

14      6.      The fact that Purely Juice's false advertising pertained to the very nature of
15 its juice product establishes its materiality.  See Johnson & Johnson Vision Care, Inc. v.
16 1-800 Contacts, Inc., 299 F.3d 1242 (11th Cir. 2002) ("A plaintiff may establish this
17 materiality requirement by proving that 'the defendants misrepresented an inherent
18 quality or characteristic of the product.'") (citation omitted).  Nevertheless, the Court
19 finds that Purely Juice's false advertising was material for the following reasons:

20          a.      In addition to the fact that the adulterated product was denominated
21      "100% Pomegranate" and this denomination appeared in large print on the
22      front of the product bottle and on the website, prominent wording
23      elsewhere on the bottle and on the Purely Juice website also falsely
24      claimed that the product contained 100% pomegranate juice.  Specifically,
25      directly above the "Nutrition Facts" panel on the bottle, in a font
26      approximately three times larger than the font displaying the nutritional
27      information, the words "100% Pomegranate Juice" appeared.  The
28      placement and size of this false statement was clearly intended to divert a

consumer's attention away from the nutritional information and to have the consumer believe that the product contained 100% pomegranate juice when it did not. Purely Juice's claims that the product has "No sugar added" also appear in large typeset prominently on the bottle.

b.     Consumer inquiries to Purely Juice establish materiality of Purely Juice's false statements. Purely Juice routinely received inquiries about the health benefits of its pomegranate juice, as well as its purity. [Exhibit 223]. These consumers also attach a great deal of importance to whether pomegranate juice contains added sugar. These consumer inquiries are consistent with plaintiff's own internal marketing research which shows that the primary reason that its customers drink pomegranate juice is for the health benefits.

c.     Purely Juice's president and founder testified Purely Juice would lose its position in the marketplace if it could not label or advertise its product as "100% pomegranate juice" with "No sugar added." This evidence firmly establishes the materiality of the false and misleading statements.

7.     The Court further finds that Purely Juice introduced its false statement into interstate commerce.

8.     For the reasons set forth in Section E, below, the Court concludes that plaintiff has suffered an injury for which damages are appropriate.

**B.     Defendants' Advertisements Constituted False Advertising Under California Business & Professions Code § 17500**

9.     The Court finds that plaintiff is entitled to relief under California Business and Professions Code section 17500.

10.     Where, as in this case, a plaintiff establishes a claim under the Lanham Act, the plaintiff is entitled to the same relief under Section 17500. See, e.g., J.K. Harris & Co., LLC v. Kassel, 253 F. Supp 2d 1120, 1130, n.9 (N.D. Cal. 2003).

11.   Section 17500 makes it unlawful for anyone to make "any statement, concerning . . . real or personal property or . . . services [being disposed of] . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

12.   An advertisement is false or misleading under Section 17500 if it is likely to deceive members of the public; actual deception need not be demonstrated. Comm. on Children's Television, Inc. v. Gen. Foods Corp., 35 Cal. 3d 197, 211 (1983); Day v. AT&T Corp., 63 Cal. App. 4th 325, 332 (1998).  The false or misleading nature of the advertisement is viewed from the perspective of a "reasonable consumer," or the type of consumer to whom the advertisement is directed.  Lavie v. Procter & Gamble Co., 105 Cal.App.4th 496, 509-10 (2003) (a "reasonable consumer" need not be exceptionally acute and sophisticated nor need a reasonable consumer necessarily be wary or suspicious of advertising claims).

13.   The Court finds that Purely Juice's advertisements were likely to deceive because, as discussed above, they were literally false.  As demonstrated by multiple, independent tests,"Purely Juice's "100% Pomegranate" product (1) did not contain 100% pomegranate juice and (2) contained significant added sugar and/or sweeteners. The advertisements were very likely to mislead reasonable consumers who did not have access to scientific analyses of Purely Juice's product and had no capacity to evaluate the veracity of Purely Juice's claims.

14.   The statute imposes on a defendant a duty of reasonable care to investigate the false or misleading nature of an advertisement when facts are present to put a reasonable person on notice of possible misrepresentations.  "People v. Forest E. Olson, Inc., 137 Cal.App.3d 137, 139 (1982).  Thus, Section 17500 extends to negligent as well as intentional dissemination of false or misleading advertising.  Khan v. Med. Bd. of California, 12 Cal. App. 4th 1834, 1846 (1993).  Based on the Court's finding that from at least early 2006, it was widely known in the super premium juice industry that there were serious issues of adulteration with pomegranate juice concentrate originating

1  from outside of the United States, and based on the evidence that defendants were
2  paying well below the market rate for pure pomegranate juice concentrate, the Court
3  concludes that defendants failed to exercise reasonable care to prevent the false or
4  misleading nature of their advertising.

5      15.    Based upon these facts, plaintiff has established that defendants violated
6  Section 17500.

7  **C.    Defendants' Advertisements Constituted Unfair Competition Under**
8  **California Business & Professions Code § 17200**

9      16.    California's unfair competition law ("UCL"),  Business & Professions
10 Code § 17200 et seq., defines unfair competition as "any unlawful, unfair or fraudulent
11 business act or practice and unfair, deceptive, untrue or misleading advertising and any
12 act prohibited by [the false advertising law (§ 17500 et seq.)]." Cal. Bus. & Prof. Code
13 § 17200.  Thus, any violation of California's false advertising law is necessarily a
14 violation of the unfair competition law. Comm. on Children's Television, Inc., 35 Cal.
15 3d at 210.

16     17.    "The UCL's purpose is to protect both consumers and competitors by
17 promoting fair competition in commercial markets for goods and services." Barquis v.
18 Merchants Collection Assn., 7 Cal.3d 94, 110 (1972).

19     18.    Like a claim under Section 17500, to state an unfair competition claim
20 under California law, it is not necessary to show that the advertising at issue actually
21 deceived any consumers; rather, "one need only show that 'members of the public are
22 likely to be deceived.'" Sony Pictures Entm't, Inc. v. Fireworks Entm't Group, Inc.,
23 137 F. Supp.2d 1177, 1185 (C.D. Cal. 2001) (citing  Bank of the West v. Superior
24 Court of Contra Costa County, 2 Cal.4th 1254, 1267 (1992)).

25     19.    For the reasons set forth above, the literally false statements made with
26 respect to "100% Pomegranate" product are exactly the type that California's unfair
27 competition laws and false advertising statute are aimed at curtailing.

28

1    **D.    Hachigian's Liability**

2       20.    15 U.S.C. 1125 imposes liability on "any person" who violates the

3    elements of the statute. 15 U.S.C. 1125 (a).

4       21.    Paul Hachigian is the president and founder of Purely Juice. The Court

5    finds that defendant Hachigian was directly involved in the manufacturing of Purely

6    Juice's "100% Pomegranate" product, including the selection of suppliers of the

7    pomegranate juice concentrate used in this product. The Court further finds that

8    defendant Hachigian was directly responsible for the marketing and advertising of

9    Purely Juice's product as "100% Pomegranate" with "No sugar added."

10      22.    Based on these findings, the Court finds that defendant Hachigian is jointly

11   and severally liable to defendants for (1) false advertising under the Lanham Act§ 43(a)

12   15 U.S.C. § 1125(a)); (2) false advertising under Section 17500 of California Business

13   & Professions Code; and (3) unfair competition under Section 17200 of California

14   Business & Professions Code. See Grant Airmass v. Gaymar Industries, Inc., 645

15   F.Supp. 1507 (S.D.N.Y. 1986) (liability covers "all those alleged responsible for falsely

16   describing and placing in commerce the advertised goods.").

17      **E.    Plaintiff Is Entitled To An Award Of Damages**

18      23.    A plaintiff who successfully establishes a violation of § 43(a) is entitled to

19   recover, "subject to the principles of equity, . . . (1) defendant's profits, (2) any

20   damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a)

21   (Lanham Act § 35).

22      24.    In order to be entitled to damages, a plaintiff making a false advertising

23   claim under 15 U.S.C. § 1125 need not prove actual harm. See Southland Sod Farms v.

24   Stover Seed Co., 108 F.3d 1134, 1145-1146 (9th Cir. 1997) (an inability to show actual

25   damages does not alone preclude a recovery under section 1117); see also Springs

26   Mills, Inc. v. Ultracashmere House, Ltd., 724 F.2d 352, 357 (2d Cir. 1983)

27   ("competitive injury is not required for recovery under section 1125(a)").

28

### 1.   Plaintiff Is Entitled To An Award Of Its Lost Profits During The Period Of False Advertising

25.    This Court finds that from the period beginning at least January 7, 2007 through August 30, 2007, Purely Juice was selling a product that contained a false or misleading representation of fact concerning the nature, characteristics, and qualities of its product.

26.    The Court further finds that but for Purely Juice's false and misleading advertising, it would have been unable to garner any sales of its "100% pomegranate juice" during this period.

27.    The Court has heard and considered the expert testimony of the parties' damages experts.  As set forth above, the Court finds certain of Dr. Luna's calculations to be more persuasive than those of Mr. Rugeti.  Nonetheless, the Court finds that plaintiff is entitled to recover lost profits on sales it would have made, but for defendants' false advertising.

28.    Based on the expert testimony offered herein, the Court awards plaintiff $1,192,905, its lost incremental profits for the period of defendants' false advertising.

### 2.   Plaintiff Is Entitled To Defendants' Profits

29.    15 U.S.C. § 1117(a) provides, in relevant part, that "[w]hen a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125 (a) or (d) of this title, or a willful violation under section 1125 (c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover … defendant's profits."

30.    A plaintiff need not demonstrate actual damage to obtain an accounting of an infringer's profits under section 35 of the Lanham Act.  See Maltina Corp. v. Cawy Bottling Co., Inc., 613 F.2d 582, 585 (5th Cir. 1980); Springs Mills, Inc. v. Ultracashmere House, Ltd., 724 F.2d 352, 356 (2nd Cir.1983); Wesco Mfg., Inc. v.

1   Tropical Attractions of Palm Beach, Inc., 833 F.2d 1484, 1487 (11th Cir. 1987); see
2   also Veryfine Products, Inc. v. Colon Bros., Inc., 799 F. Supp. 240, 259 (D.P.R. 1992)
3   ("[i]n determining the entitlement to defendant's profits as an element of monetary
4   relief, the plaintiff need not demonstrate any actual damages in order to obtain an
5   accounting for profits").

6        31.    Moreover, an award of defendant's profits under 15 U.S.C. 1117(a) for a
7   violation of 15 U.S.C. § 1125(a) is not dependent upon a showing that the violation was
8   "willful". Quick Techs. v. Sage Group Plc, 313 F.3d 338, 348 (5th Cir. 2002) ("[i]n
9   accordance with our previous decisions, and in light of the plain language of § 1117(a)
10  … we decline to adopt a bright-line rule in which a showing of willful infringement is a
11  prerequisite to an accounting of profits."); Banjo Buddies, Inc. v. Renosky, 399 F.3d
12  168, 174 (3d Cir. 2005) ("[t]he plain language of the amendment indicates that
13  Congress intended to condition monetary awards for § 43(c) violations, but not § 43(a)
14  violations, on a showing of willfulness.").

15       32.    In assessing defendant's profits the plaintiff shall be required to prove
16  defendant's sales only.  15 U.S.C. § 1117(a).  "The burden then shifts to the defendant,
17  which must prove its expenses and other deductions from gross sales." Wesco Mfg.,
18  Inc. v. Tropical Attractions of Palm Beach, Inc., 833 F.2d 1484, 1487-1488 (11th Cir.
19  1987). See Competition Specialties, Inc. v. Competition Specialties, Inc., 87 Fed.
20  Appx. 38, 43 (9th Cir. 2004).

21       33.    As set forth above, this Court finds that from the period beginning at least
22  January 7, 2007 through August 30, 2007, defendants were selling a product that
23  contained a false or misleading representation of fact concerning the nature,
24  characteristics, and qualities of their product, and that as a result thereof, plaintiff
25  suffered damages in the amount of $1,192,905.

26       34.    Further, the Court finds that defendants' sales during the period of false
27  advertising, as proven by plaintiff, were $3,667,393.  The Court further finds that
28  defendants' incremental profit margin during this period was 8.32%.

1    35.    Accordingly, the Court awards plaintiff, pursuant to 15 U.S.C. 1117(a)(1),

2    Defendants' profits in the amount of $305,137.

3    **F.    Plaintiff Is Entitled To Injunctive Relief**

4    36.    Injunctive relief under the Lanham Act is appropriate where the plaintiff

5    establishes that (1) it will suffer irreparable harm if the injunction is not granted, (2) the

6    potential injury to plaintiff if the injunction is not issued is greater than the potential

7    injury to defendant if the injunction is issued, and (3) that the public interest favors the

8    granting of an injunction. <u>Novartis Consumer Health v. Johnson & Johnson-Merck</u>

9    <u>Consumer Pharm. Co.</u>, 290 F.3d 578, 595-97 (3d Cir.2002).

10    37.    There is substantial evidence showing that plaintiff has and will continue

11    to suffer irreparable harm in the form of loss of customer goodwill, lost current and

12    prospective business relationships, and tarnished reputation as a result of Purely Juice's

13    actions.  Among the concerns raised by consumers in purchasing plaintiff's 100% juice

14    is the price.  When faced with what appear to be two identical products, each purporting

15    to be 100% pomegranate juice, with one (*i.e.*, Purely Juice) priced substantially less

16    than the other (*i.e.*, POM Wonderful), a consumer may reach the incorrect conclusion

17    that plaintiff is overcharging its customers.  Unless enjoined, there is a likelihood of

18    repetition of the manufacturing of adulterated juice, particularly because Purely Juice

19    relies exclusively on imported pomegranate juice.

20    38.    Purely Juice will not suffer any hardship if it is asked to not distribute

21    falsely advertised products.  Indeed, there is no harm to a defendant from an injunction

22    which prevents continuing dissemination of false statements: "Nothing prevents [the

23    defendant] from describing the quality of its products, comparing the quality of the final

24    image its scanners deliver to the host computer with those provided by competing

25    scanners or touting its [other technology]." <u>Visioneer, Inc. v. UMAX Technologies,</u>

26    <u>Inc.</u>, 1998 U.S. Dist. LEXIS 23431 at 7-8 (N.D. Cal. 1998).

27    39.    Here, the relief sought by plaintiff merely requires that Purely Juice

28    participate in a level marketplace, and advertise its products without the use of false

- 25 -

1  statements and misrepresentations. "Such requested relief poses little, if any, harm to
2  [the defendant]." <u>Sun Microsystems, Inc. v. Microsoft Corp.</u>, 87 F. Supp.2d 992, 998
3  (N.D. Cal. 2000).[2]  In contrast, there is no question that literally false advertising that is
4  material harms both consumers and competitors.  Courts often presume that a
5  competitor is harmed by the dissemination of false statements about a competing
6  product. <u>Creative Labs, Inc. v. Cyrix Corp.</u>, 1997 WL 337553 (N.D. Cal. 1997).  This
7  harm will occur if Purely Juice chooses again to sell an adulterated, inferior
8  pomegranate juice product.  Thus the relative hardships plainly weigh in favor of
9  issuing an injunction and precluding Purely Juice from misrepresenting the contents of
10 its products as it plainly did until at least as late as August 2007.

11        40.    "There is a strong public interest in preventing false advertising of
12 products in the marketplace." <u>Kennedy Industries, Inc. v. Aparo</u>, 416 F. Supp.2d 311,
13 317 (E.D. Pa. 2005) (enjoining false advertising of a product where scientific testing
14 showed that claims were literally false in part because of public interest); <u>see also</u>,
15 <u>Resource Lenders, Inc. v. Source Solutions, Inc.</u>, 404 F.Supp.2d 1232, 1249-1250 (E.D.
16 Cal. 2005) ("because a likelihood of confusion was demonstrated, the public interest
17 would be served by issuance of an injunction"); <u>Church & Dwight Co., Inc. v. S.C.</u>
18 <u>Johnson & Son Inc.</u>, 873 F. Supp. 893, 912 (D.N.J. 1994) (granting injunction
19 preventing defendant from deceptive advertising and stating that "the public has a right
20 not to be deceived or confused.").

21        41.    Here, where Purely Juice has made false claims as to the contents and
22 composition of its product, and the public is thereby deceived into paying for what it
23 believes to be 100% pomegranate juice product with all of the associated health
24 benefits of 100% pomegranate juice, the public interest clearly favors injunctive relief
25 to prevent the false advertising of Purely Juice's product.

26

27        [2]    Unlike Purely Juice, upon learning that their 100% pomegranate juice products
28 were found to contain significant levels of adulterants, PepsiCo and Florida Bottling took
   immediate action to investigate and correct the problem.

42. As discussed above, authentic pomegranate juice has very high levels of unique polyphenols, antioxidants that are particularly effective at neutralizing free radicals, preventing oxidation of LDL cholesterol (the "bad" cholesterol) and plaque build-up in the blood vessels. In addition to its benefits to cardiovascular health, pomegranate juice has also been shown to have great promise in treating cancer, including prostate cancer. Research also has suggested that pomegranate juice may benefit diabetics.

43. These research studies were limited to the nutritional benefits and healthy effects of drinking *100% pomegranate juice*. If a product labeled as "100% pomegranate" juice is not, in fact, genuine pomegranate juice, it may not have the same chemical and nutritional properties, such as high levels of unique polyphenols, as real pomegranate juice. Added sugar and other undisclosed adulterants, such as those included in Purely Juice's product, dilute the concentration of pomegranate-specific compositions, such as unique polyphenols, that have been shown to have various significant health benefits and, worse, the adulterants themselves could cause unanticipated negative health effects.

44. Accordingly, there is a strong public interest in ensuring Purely Juice has put an end to its false advertising and injunctive relief is appropriate. Based on the foregoing the requested injunctive relief is hereby granted.

IT IS SO ORDERED.

Dated: July 17, 2008

*christina a. snyder*

CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE